Your Honor, it's the second case of the morning, call 212-0232, Peeble v. Maria Talavera, on behalf of the defendant, Mr. Larry Wechter, on behalf of Peeble, Ms. Jonker. Mr. Wechter. Good morning. More to the court. Larry Wechter for Mario Talavera. In this case, my client testified at the trial that he held the gun that fired the shot that killed Hector Munoz. He testified that he jerked the gun up, causing it to discharge, and he had no intention whatsoever to shoot the decedent. So the only contested legal issue for the jury in this case was my client's mental state at the time the gun fired. The parties had directly conflicting theories as to that mental state. The state's theory, of course, was that it was an intentional act motivated by revenge for violating gang rules. But, of course, that evidence was impeached and undermined in certain respects by the defense. For example, the state's witnesses denied that there was any plan in existence to shoot Munoz. Some of them testified pursuant to plea agreements and admitted that they were gang members, so their testimony was undermined in those respects. Raul Gomez claimed that when my client got into the other vehicle after the shooting, that he reveled in the fact that he had shot Munoz. However, he was impeached by the fact that he failed to tell this to the police. He failed to tell them even that he had been present at the time of the shooting. And there was a suggestion that he and his brother, Julian, were protecting one another in this situation. What did the record reflect as to the make and model of the weapon? It was a handgun, of course. Was it a pistol or a revolver? You know, I don't recall for sure, Your Honor, but I'm not certain even that there was much of a description. Was it a .38 special or a .380 auto? My recollection is that it really wasn't described in detail. And, in fact, after the police were looking for evidence of the crime, my recollection is they didn't even recover the weapon, so they didn't know for sure. Well, the reason why I'm asking is because a revolver normally, unless it's been altered by a gunsmith with sophisticated magnet-type keys, the revolver doesn't have safety. An auto pistol may or may not, or a semi-automatic pistol, self-loading pistol, may or may not. If this was a pistol, it could have been double action or single action, and it also could have had a safety on it, which could or could not have been gauged. So it would be nice to know what the weapon was like, because if it was a revolver, you can have double and single action revolvers, but usually in modern time, it's a double action, which meant that you can fire the gun just by pulling the trigger. Whereas if it's single action, you have to cock the trigger and then cock the hammer and then pull the trigger. So it would be nice to know, because in the process of firing the gun might give the jury or the trier of facts some indication of just exactly what the procedure was, whether it was conducive to an accidental firing or whether it wasn't. My recollection is that although, of course, all of those things would be nice to know, as you say, that none of them were introduced into evidence. The gun was not recovered. My recollection is that the gun was described as shiny, or my client described it as being something that looked nice to him. Somebody said chrome, I think. Maybe chrome, something like that. But I think that none of those facts were introduced into evidence, and if the gun was not recovered, of course, there was no way to examine it. You had addressed, when you were talking before Justice McLaren asked his question, you were talking about basically the credibility of the witnesses, what Julian and Raul Gomez said to the police officers and testified to before the jury. And then you said they were impeached or they're cross-examined, if you will. Isn't that the credibility determination, that is the jury's job, isn't it? Sure. And what is our standard of review here at the appellate court? Well, at the appellate court, this is a Stage 2 case, of course, rather than a Stage 3 case where the judge makes credibility determinations on the post-conviction case. We're not that far along yet. We're still at Stage 2, where it's a determination as to whether there's been a substantial showing of a violation of a constitutional right. You know, I was thinking about this, again, probably for the 50th time the other day, and it occurred to me that there are some analogies to be drawn between the different stages of a post-conviction case and certain determinations or certain motions in civil cases. So, for example, even though the procedure is not exactly the same, at Stage 1, we're talking about frivolousness. And it seems to me that that's similar to a determination that's made in many 2-615 civil cases, where it's a decision as to whether you've alleged a claim on which relief can be granted, whether the case should be dismissed. It seems to me that's an awfully similar determination to whether a post-conviction case is frivolous. There's just no way, sir, that you've alleged enough in this petition to grant any relief to you, so we're dismissing right now. The analogy is arguable basis, that there's an arguable basis. Well, that's what we're on Stage 2. Pardon? Arguable is Stage 2? I think that's Stage 1, isn't it, counsel? Stage 2 has to do with a substantial showing, not an arguable basis. Arguable showing? Well... What do you mean? I know you've used those terms, both of them, and I was puzzled by your using arguable at the second stage. What do you mean by that? Well, first of all, backing up to Stage 1, if I may, I think the Supreme Court is absolutely clear about what Stage 1 means. It means there's an indisputably meritless legal theory or a fanciful factual allegation. That's the Supreme Court in Peabody-Hodges. So you have no basis on which we can grant you any relief whatsoever. The substantial showing in Stage 2 seems to me to be similar, equivalent, if you will, to a motion to dismiss on the pleadings, or a motion for summary judgment, because then you're determining whether there is any material issue, genuine material issue of fact, and whether you're entitled to judgment as a matter of law. It seems to me that's the equivalent of Stage 2. And the cases that I cited in the brief talk about, use the language of whether the petitioner has made out an arguable case. I believe the floor language is that it is arguable that the plaintiff or petitioner can sustain a prima facie case, not necessarily sustain the entire cause of action at that time, because there may be affirmative defenses or whatever. So you're right, it's arguable, but it's arguable about whether or not they can sustain a prima facie case. And there are claims that you're making that may not undermine the conviction such that you have made a prima facie case, that there is a probability that there would have been a different result upon a different trial or a retrial. Well, what I'm referring to are the cases that are cited in pages 20 to 21 of my brief. For example, there's language talking about is there the articulation of a plausible, and I emphasize plausible, defense, or have you asserted an arguable probability, and I emphasize arguable, of a timely appeal? Thank you. In this case, counsel, talking more specifically about some of the more detailed issues that you addressed, if the jury had believed the testimony of the defendant that the gun had discharged when he just reached over and yanked it up from the seat, couldn't it certainly have acquitted the defendant of first-degree murder? I think it's always possible, of course, for a jury to acquit. I think the law is that we're not supposed to argue nullification, but I mean, that's always a possibility. And so how is his attorney ineffective for focusing during his closing argument on the accidental, let's say, state of mind or the circumstances that would call this accidental? Well, the rock-bottom problem, I think, is that his counsel abandons the compromise verdict in arguing the case. He doesn't say in the instruction. But it went to, excuse me, as Justice Shostak said, it went to the jury. That instruction went to the jury. That's right. That's right. But if in every case the jury gets an instruction on the lesser and that's the end of the story, that would mean that all this case law about the importance of closing argument is irrelevant. Well, you have a limited time. Counsel has a limited time in closing argument. Right. Is it not trial strategy to use his time to argue acquittal and give that instruction so that maybe they can look at the instruction, but he's really focusing on acquittal? How is that not trial strategy? Because he abandons manslaughter. He doesn't say a single word about it in his closing argument. And the implication of his argument is manslaughter is wrong. Are you married? That's what's implied here. Are you married, Counsel? Pardon me? Are you married? 29 years, 9 months. Are you telling me that we are against it? You've abandoned the issue because you didn't speak up about it? Well, but the defendant has the absolute right to say he wants or he doesn't want a compromise verdict submitted to the jury. Right? And we'll agree on that. My point is it's one thing to say abandon based upon affirmative acts as opposed to base it on acts that didn't take place in an affirmative nature. And the fact that he didn't comment on it doesn't necessarily mean that he abandoned it. If he had said I do not want you to render a verdict on this instruction, then I would buy your argument that he had abandoned it. So there's still some issue as to whether or not you can abandon something during closing argument by not mentioning it. Just like whether or not if you don't mention all the issues that are in your brief, have you abandoned them here? No, you haven't. But doesn't his client have the right to say I want that compromise verdict submitted to the jury? And he did in this case. He said that and it was. And he did. And that implies I want you to tell the jury that if you don't buy acquittal, you've got to give me manslaughter. Not necessarily. And I think in a sense this is going far afield because there are different trial judges who allow different amounts of detail to be discussed during closing argument about the instructions that the jury will get. Some judges just allow them to touch on the name of it. Others will allow them to paraphrase it. Others insist that it be read if it's going to be mentioned. But if A, you say nothing about it, A. That doesn't mean that it doesn't exist. Right. But if B, you say something that's a misstatement of the law, isn't that a problem? How is there a misstatement of the law here? Because he's standing up in front of the jury and he's saying these facts equal an acquittal. If they're believed, are they not? But he doesn't say a word. No, because he doesn't say a word about manslaughter. If your client says I want this verdict given to the jury, you've got to advocate for it, number one. Well, not if he wants an acquittal. Not if he wants his client to be acquitted. He wouldn't put very much emphasis on it at all and maybe not even mention it. And again, as Justice Shostak said, we're talking about trial strategy here. Wouldn't it be different if he argued involuntary manslaughter but never gave the instruction? Well, not giving the instruction when the client wants it, that's begging for a reversal, obviously. Correct. But then you would be here arguing the jury didn't get to even see an instruction on involuntary. They saw the instruction here. He just put all his eggs in the basket of acquittal. Again, isn't that trial strategy? It seems to me it's a combination of the fact that he doesn't argue for the verdict that his client wants. That's number one. And number two, he says these facts equal an acquittal when in law they don't. All the law is that if you're handling a dangerous weapon in the presence of other individuals and somebody gets hurt, that's at least recklessness. At least recklessness. Can I direct you one more? So the three bases that you say that his attorney was ineffective was because of that lesser-included offense. Also, you said he was ineffective because he enlisted testimony from the three witnesses that tended to prove the state's case. I'm going to focus in on Dr. Joseph Kogan and how you said that Dr. Kogan's testimony helped the state. How did Dr. Kogan's testimony hurt your client? Because the closer that weapon is to the back of the head of Mr. Munoz, the more likely it is it's an intentional act. During his direct testimony, he testified to a range. And on cross, the range wasn't any different. But it was different because the state's elicits, if I may for a moment, testimony that Munoz was shot from a maximum distance of 18 inches and it was not a contact wound and there was no evidence in the state's case of a minimum distance elicited by the prosecutor. Well, maximum implies a minimum. All the jury knows at that point is at most it was 18 inches. Maybe it was 17, maybe it was 60. Now all of a sudden in the defense case, it's I think one inch. Yeah, it's one inch from Munoz's head. So the closer the weapon is to the head, the more it indicates that it's an intentional act. Well, Munoz has a seat all the way back. He rides with his seat all the way back. And your client was in the back seat. So whether it was intentional or whether it was accidental, he was within a very short range. But the choice, the real choice is between intentional and reckless. You grab the gun. You know it's a gun. You know it's loaded. You know there are people sitting in the car. You know, this is a far less serious crime, and we're going to allow defense counsel to just not talk about this whatsoever. I mean, that's the problem. I've never heard of an opinion given that indicates that the distance between the barrel of the gun and the victim is evidence of accident or lack thereof. Can I back up one short step? Yes. Aren't we here to determine, though, whether the contents of the petition arguably would sustain a reasonable probability of a different result? That's all we're here to determine. And the rest of it is for Stage 3, and we've never gotten there. It's not just to determine arguably whether or not your allegations will or will not be sustainable. It's a question of whether or not, if they were sustainable, would they necessarily result in a different disposition or require a retrial? Only a reasonable possibility, Your Honor. My point is that this argument that you're making about the distance to the head, as far as I'm concerned, is a non sequitur. So even if it were true, it wouldn't change anything. Now, we can argue about what the testimony was, but as far as I'm concerned, the distance between his head, based upon if what you say is true, and I believe your client, I wouldn't disbelieve him because the gun was only an inch away from his head as opposed to 18. Aren't we getting perilously close, though, to a harmless error analysis here? I mean, I think we're, if I can use maybe a bad choice of words, we're just in the gun here. The difference in whether or not there's a probability of an alternative disposition or the need for fairness in the judicial process is not the same standard. It's not stage three? I said it's not the same standard. Aren't we still guided, counsel, by Strickland v. Washington when it comes to ineffective assistance? Sure. But I don't think that changes my argument. My argument is at this stage of the case, all I have to show is this arguable, this substantial showing, which is an arguable basis for whether there's a reasonable probability the result could have been different. The result in this case is determined by a decision as to what's in my client's head when the trigger is pulled. And the counsel's performance fell below an objective standard of reasonableness. You have to prove both of those, right, for ineffectiveness? Right. We have to make that determination under the Strickland standard. But Strickland is, I would say, Strickland is a, finally, a stage three determination. We're not yet at that point where we decide whether counsel's been ineffective or not. Well, we actually have to apply it at stage two. Otherwise, what's our guideline? To determine if any of these, if there is a substantial showing, if any of these arguments has any merit whatsoever. Right. Arguably, if you want to use your term, although I don't agree that that's the term we should use. Why is there no arguable merit to any of these claims is the question. And it seems to me part of the problem here is the case law is absolutely clear on what a stage one proceeding is. But it's not absolutely clear what a substantial showing is. I think you, in my opinion, you confuse what is arguably, when you say has merit, relates to whether it is will or will not be arguably established as you allege factually. It is another thing to suggest that assuming arguendo, that you establish the factual basis upon which your petition sets forth facts, will they arguably also sustain a reversal of the judgment and a new trial? And that you haven't addressed, in my opinion. You've addressed merely is what I'm alleging arguably sustainable or establishable. And maybe yes, maybe no. But, you know, proving the cliche, the price of tea in China has nothing to do with the merits of this case. And you could establish what the price of tea was. But it doesn't necessarily establish that your client's entitled to a new trial. So that's where I'm coming from. And it sounds like from the comments and questions of the panel, that's where they're coming from as well. And you are coming from a different position. Well, my position simply is that we're getting ahead of ourselves if we're deciding at this stage of the case whether we're entitled to a new trial. That's a stage three determination. Okay. Any other questions? Thank you. May it please the Court. Joan Kripke on behalf of the people of the state of Illinois. Counsel. Counsel, do you agree with counsel that trial counsel was ineffective when he abandoned the involuntary manslaughter instruction by not arguing it? Well, I don't think he abandoned it. And, no, I don't think his counsel was ineffective. I mean, when Mr. Wechter said that all his client wanted was a verdict of involuntary manslaughter, first of all, I don't know where that comes from. It's nowhere in the record. But I thought the obligation was really to get an acquittal. And he did not abandon that position whatsoever because, as you have pointed out, the instruction was given. It's our position that, and what's important in this case and what we rarely see is the defendant testified. And his entire testimony was, I don't know what happened. It was an accident. I didn't, I wasn't arguing with Hector. I wasn't mad at Hector. He said, no, Hector was my friend. There's no testimony that he was intoxicated. There was testimony that he had been drinking. There was no proof that he was intoxicated. Did he ever admit that he was reckless and acted with willful disregard? No. He said it was an accident, you know, and he's talking, you know, guns just sort of go off. So I made sure it was pointing away from me. I didn't want it in my pants. All of that indicates it just went off. I reached. I was foolish. I wanted to wave it around. And the question you were asking about what kind of gun it is, I think it's not important. But the only thing besides it being a shiny chrome gun, there was testimony that he threw the bullets out the window while they were traveling to Aurora, which would indicate. I mean, I don't know. I've never handled a clip, but I don't know. Can you shake the bullet? I mean, why don't you just. Oh, so he could have. So I don't know. So either it sounded, though, that he was shaking bullets out. So whether that makes a difference or not. If you can address counsel's position with respect to our standard of review and the way we should be proceeding on a stage to post conviction petition here today. I think the law is really clear that what you want is what Strickland says. You have to first. He first has to show that there was some sort of a constitutional violation, and he's making that allegation in stage one. But he completely fails to show, to prove up the second prong of Strickland, which is his burden to show. And but for this, the result of the trial would have been different. The defendant never has shown that but for the fact that his counsel failed to actively argue for an involuntary manslaughter verdict, that that would have happened. And he would not have been convicted of murder. But does he have to prove it at the second stage? Like you had said, you used the word prove. He has to. He has to. He has. Yes, he has to make that showing. A court makes the prejudice. A court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. That's the standard. That's what he must demonstrate. And when the defense counsel refers to Hall, I went back and looked at Hall, and this isn't in my brief, and I realized why I was confused by where he was getting this rather diluted language about the standard. Hall is a very different case. Hall was a case where there was a guilty plea. And when you read the decision of Hall, embedded in it is the language that defendant extracts from it, one sentence from it that talks about a plausible or this, that all we had to do was give some kind of plausible argument that would have rendered a different verdict at the trial. That's if the counsel had made a motion to withdraw the guilty plea. But that's, and Hall says very specifically at the beginning of the holding, under these circumstances, those circumstances of a guilty plea are not the case before us. And the other point that's important to look at is that the list of cases the defendant goes through, and I went through them all again the other day, about involuntary manslaughter and murder. Those were reasonable doubt cases. And what the defendant was arguing in those cases was that I should have gotten an involuntary instruction or my counsel didn't argue for involuntary. If this defendant had gotten involuntary, he would be up here today saying, hey, why didn't he argue for an acquittal? He should have argued for an acquittal. And why would he have been saying that? Because the defendant testified it was an accident. How could counsel have gotten up there and said, accident, accident, accident. He said it was an accident. There's no recklessness. He never once said that there was any recklessness. And then say, and, you know, if you really don't believe my client, then how about involuntary? How could he have done that? But now, counsel, if the defendant, if it is the defendant's choice to request an involuntary instruction in this case, how is that a meaningful choice if his lawyer doesn't say a word about it to the jury? He got the choice because the jury is instructed very rigorously. These are the verdict forms. They were told you can either find them guilty of murder, find them not guilty of murder, or find them guilty of involuntary manslaughter. They're told you can't render a verdict of guilty of murder and involuntary manslaughter. They were told the same thing about the involuntary instruction. They were given the definitions, and they were told you must follow these instructions. You must decide these things. And the case law is very clear all the way through that it's up to the trier of fact to make a decision on whether there's recklessness or whether it's an accident. And so why should the defense counsel get up there and try and muddy the waters? He's giving a very clear-cut argument to the jury. My client is a kid. He was reckless. He was waving a gun around in the car. He was being stupid. Well, he was intoxicated, no less. We don't know if he was intoxicated. He said he had been drinking. How about the testimony of the defense counsel in putting the doctor back on to testify as to the distance of the shooting? Well, first of all, the doctor testified that within 36 inches, that's close. So he's sitting in a sedan. As you pointed out, I had forgotten that Hector had the seat back. So common, everybody knows how far approximately that is. Even if Hector had the seat way up, it's probably not. It may be 3 feet. It may be 36 inches. Again, and the doctor said, I don't have the gun. I can't give you anything with precision. He said it's 1 to 18 inches. And then he said the same thing again. I don't think that it shows. I think that when you're in a car and they're going to make a decision between, because the doctor never said, it was in, I don't think it really matters of whether or not he came out and gave a precise distance, thank you, of how far the gun was from his head. He said it wasn't a contact wound. And one would think that there would be, why would you fire it, if you had the intent to kill, wouldn't you expect to find a contact wound? But regardless of what it is, let's go back to what the standard of review is. Even if that was error by his counsel to have elicited that testimony, was that the testimony that took, that prejudiced the defendant so much that they found him guilty of murder and not of involuntary manslaughter? Because there's all kinds of other tests and there's all kinds of other evidence against the defendant, including the fact that... What about, though, the some papers comment, didn't that threaten to tip the balance against the defendant? Because how much other evidence of motive really was there? The defendant jumping out of the car and immediately running back to Kristin Garza's car. Immediately. They didn't, he wasn't even stunned and said, well, this was my friend, I didn't know, I don't know what happened to him. Why should I wait for the police? We wanted to get away from that. It's consciousness of guilt. The fact that there was testimony, I shot the trick. He said he didn't say that there was question about whether that was impeached or not, but it was out there and that was for the jury to decide. So all of that really, and the fact, the defendant himself testified about the fact that I knew Hector testified, but he didn't say anything about me. And exactly what, when you look at the testimony of Julian Gomez or whoever, Raul, about the papers, I mean, papers. There were papers on Hector Gomez. What does that mean? It was completely, I don't know, it was amorphous. It didn't mean anything. He didn't come out and say, well, Hector Muñoz testified this, this, and this. And let's go back to what Hector Muñoz did testify about. Well, he certainly, and that goes to the third issue here. Hector Muñoz never was testified at a trial in which the defendant's name came up. He didn't. He was, and the defendant was able to cross-examine the three attorneys who were involved in those two cases in which Hector Muñoz did testify. They involved other Latin king names, but the defendant's name wasn't part of them. So it wasn't the idea, it all went to the point that Hector testified, did something that was unacceptable to gang members. That is, identified other members of a gang and testified about a gang. Right. So that act and doing that was motive enough for him to be killed. But the defendant said, but the defendant himself testified about it. He said, yeah, I know Hector testified. Did it bother, he didn't say that, he didn't say, and he said we had no intent to do this. We had no motive to kill him. There was no plan. There was no discussion of it. That was the state's theory. He's an admitted Latin king member. They all know that. If the state wanted to make that, to draw that analogy, the state was able to do it. But how was that going to come in and prejudice the defendant in such a way? When you go, if you look at my brief, when you look at the testimony, it was so, part of it, the part with Bill Wolfe, they said, with Julian Gomez, he said, do you remember being asked those questions and giving those answers? He said, yes. And he said, well, do you remember being asked those questions? And he said, I don't remember. I can't remember. I mean, he wasn't giving any testimony of substance anyhow. Paper on Hector testifying. Were you familiar with the fact that Hector had testified? Yeah, Hector told me he testified. And then they said to Gomez, the entire time you were with the defendant, did he ever say to you it was an accident? He said, no. So I'm not really sure where this came from. And the defendant himself said, were you aware that Hector Munoz had been charged and had testified on his own behalf? And he said, did I know he had a case? And he said, yes. And he said, was there anything about his testimony in that case or any other case that counsel caused you or any member of the Latin Kings to want to harm him? Answer, no. Came from his own mouth. So I don't see how that was prejudicial. I mean, the state was allowed properly to bring it in because that was the theory of their case. How do you distinguish the Lemke case? Well, Lemke was distinguishable on the fact that, first of all, I don't believe they gave involuntary instruction in Lemke. They just gave a murder instruction. But Lemke came, and that was a reasonable doubt case. Lemke was, they were drunk. They were admittedly both drunk. They had had altercations. He and the victim had had altercations before. They were involved in an altercation on the day of the shooting. He then left the yard where they were fighting, went in the house, brought the gun out from the house, aimed it at the victim, and said, get out of my yard. Here, there's no testimony that they were in an altercation. Hector was my friend. I wasn't mad at him. We'd been partying together, and there was no, and he never said I aimed that gun at him. He said it just went off when I jerked it up with my hand. And that's the difference. That's why there was, the court sent it back in Lemke for recklessness. There was no testimony even comparable in this case. Lemke was decided back in 2004. That was even before the direct appeal in this case had been decided, right? So I'm not sure how counsel could have been, appellate counsel there could have been ineffective for raising the argument in Lemke, but at any rate. I don't think he was either. I don't think that the, I also, in response to what the defense counsel said, I don't, he said there was a nullification argument made by the defense counsel, and I think that that's patently wrong. I mean, he did not nullify, a nullification argument is when they go in and you would have said, well, we gave you an involuntary instruction, but I don't want you to even think, don't even think about that. You go in and acquit this man. He just, he just went and said, I think he should be acquitted. And again, the defendant himself was testifying. It was an accident. How would it look if his counsel got up there and said, well, it was an accident and he testified it was an accident, but maybe you should consider something else. He's going to undermine his client at that point. Are there any other questions? No, thank you. Thank you. If I may, I'd like to make just a couple of quick points. And with all due respect to Ms. Kripke, what I hear is a stage three argument here. And what's been forgotten in all this discussion, it seems to me, is that this is a pleading issue before the court. We're here at stage two to determine the equivalent of a motion to dismiss on the pleadings. Not to discuss in great detail what the facts of the case were, whether the defendant had prevailed at trial, et cetera, et cetera, et cetera. So we have a petition that says, here are the facts. The facts are undisputed. Here is the case law. We're talking about Brocksmith. We're talking about the issue of recklessness. We're talking about the importance of closing argument. It seems to me that we've made an arguable case that there's a constitutional violation here. But doesn't that change when you bring in the ineffective assistance of counsel? Well, no, because if we have to prove at stage two a motion stage, if we have to prove all the elements of Strickland, then what's the difference between stage two and stage three anymore? There isn't any. You sure about that? Positive, Your Honor. You know what? You remember the common law of demerit? Just like the 29 years, 9 months, and 6 days. And, you know, this talk about accident. What we're using, what counsel's using here is the lay understanding of the word accident. Well, it just sort of happened, and I really didn't intend to do it. But the legal definition is different. An accident would have been if a person doesn't know the gun is lying on the floor of the car beneath a shirt, let's say. And he goes to pick the shirt up off the floor and has no idea that he's grabbing a gun, and the gun goes off. That legally is an accident, certainly. But when you know there's a gun, and you know that it's loaded, and you know people are sitting close to you in the car, and you grab it and you pick it up, that's recklessness. How is a lay jury supposed to understand and evaluate these types of concepts when, frankly, lots of lawyers struggle with them? And counsel gets up there and says not a single word about it, even though that's what his client wants. Any other questions? Thank you very much. Thank you. That'll be a short recess. We have other cases on the call.